UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

AUG 28 2019 PM3:08
FILED-USDC CT-NEW HAVEN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR DEVICES | **TO BE FILED UNDER SEAL**<br><br>APPLICATION FOR SEARCH WARRANTS<br><br>Case No. ___3:19mj. 1330(SALM)___ |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Keith Warzecha, having been duly sworn, do hereby state:

### REQUEST

1. I submit this affidavit for the limited purpose of establishing probable cause for the issuance of warrants for six (6) cellular telephones and one (1) SIM card (collectively referred to as the "Target Devices"), described below and in **Attachment A**, for evidence pertaining to violations of 21 U.S.C. § 841 (Possession with the Intent to Distribute, and Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Possess with the Intent to Distribute Controlled Substances); 21 U.S.C. § 843(b) (Use of a Telephone to Facilitate a Narcotics Felony); and Title 18, United States Code, Section 924(c) (Use of a Firearm in Furtherance of a Drug Trafficking Crime) (hereinafter, the "Target Offenses") by GEOFFREY GORDON and others, as described in more detail in **Attachment B**.

2. The Target Devices are:

   i. Silver Apple iPhone S, Model A1687, in a black case in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-1");

   ii. Black AT&T Samsung Galaxy S9+ in a clear case in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-2");

1

    iii.   Black LG AT&T flip phone number Model LGB470, assigned telephone number: 907-599-0284, in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-3");

    iv.   Black AT&T flip phone Model SGH-A157, in DEA Evidence Bag S001240572 (hereafter referred to as "Target Device-4");

    v.   Black and Blue Alcatel smart phone Model 50595, in DEA Evidence Bag S001240572 (hereafter referred to as "Target Device-5");

    vi.   Black AT&T LG flip phone in DEA Evidence Bag S001240594 (hereinafter referred to as "Target-Device-6"); and

    vii.   a H20 Wireless 4G LTE smart SIM card with receipt bearing telephone number 313-802-1475 (hereafter referred to as "Target Device-7").

## AFFIANT'S TRAINING AND EXPERIENCE

3.   I am employed as a Special Agent with the Drug Enforcement Administration (DEA), Hartford District Office, and have been so since August 2010.  I have been employed with the DEA as a Special Agent since 1996, and until August 2010, I was assigned to the Little Rock (Arkansas) District Office and have been so since August 2010.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, offenses set forth in Title 21, United States Code and other federal felony offenses.  I am also a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4.   During the course of my career with the DEA, I have participated in numerous criminal investigations, including many investigations into suspected narcotics trafficking, money laundering and violations of firearms laws.  My participation in these investigations has included:  coordinating controlled purchases of narcotics utilizing confidential informants, cooperating witnesses, and undercover law enforcement officers; coordinating the execution of search and arrest warrants, many of which have resulted in the seizure of narcotics, firearms and drug paraphernalia used in narcotics distribution; conducting electronic and physical surveillance, including participation in the conduct of wiretap investigations; analyzing records related to narcotics trafficking; testifying in court proceedings; and interviewing informants and cooperating witnesses, many of whom are involved in drug distribution activity, and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute controlled substances.  I have participated in several investigations involving the use of court-authorized interception of wire and electronic communications.  I have also received instruction relative to conducting drug investigations while attending the DEA Academy in Quantico, Virginia.  In addition, I receive periodic in-service training relative to conducting drug investigations.  In the course of my duties as a DEA Special Agent, I have prepared affidavits in support of applications for search warrants and arrest warrants and have executed numerous search and arrest warrants.

5.   I have written and executed search warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations.  I have participated in numerous investigations involving individuals suspected of distributing illegal drugs in both state and federal drug investigation, coordinated controlled purchases of illegal drugs utilizing confidential sources and undercover police officers, written, obtained and coordinated the execution of search and arrest warrants

pertaining to individuals involved in the distribution of illegal drugs, and spoken with informants and subjects, as well as other local, state, and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  I have prepared numerous affidavits in support of applications for search and arrest warrants which have resulted in orders being issued by judges, and have led to the conviction of numerous defendants for violations of narcotics laws.

6.    Based on my training, experience, I know that drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators, contraband, and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug trafficker's possession or residence or are frequently stored electronically on wireless telephones, i-Pads, computers, and other electronic devices.  I also know that drug traffickers often use multiple phones to facilitate their illegal activities.  Drug traffickers will utilize multiple phones in an effort to conceal their identities as well as to separate customers and source of supply.  Drug traffickers will frequently change cellular devices and cellular numbers to avoid detection by law enforcement.  Drug traffickers utilize their phones and various phone related features and applications, such as messenger and text messaging, to contact each other and arrange drug transactions.  Drug traffickers often subscribe these phones in fictitious names and at fictitious addresses in an effort to conceal their identities and connection to the phones.  Drug traffickers frequently store the contact information for criminal associates in their phones, often under an alias.   Drug traffickers will also access internet-based applications such as Facebook, in furtherance of their trafficking activities.  Drug traffickers will also utilize their phones' GPS or

location services to arrange meetings and to find meet locations for the purpose of conduct narcotic transactions.

## PROBABLE CAUSE

7.     I am one of the case agents investigating members of a drug trafficking organization lead by Anthony WHYTE for violations of the Target Offenses.  As described below, a wiretap investigation revealed that GORDON supplied kilograms of cocaine to WHYTE for distribution in Connecticut.  Because the information and evidence gathered during this investigation is voluminous, I have not included each and every fact known to me concerning this investigation.  Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested warrants.

8.  On August 6, 2019, in the District of Connecticut, a federal grand jury returned an indictment charging GORDON with conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, and he was arrested pursuant to federal warrant on or about August 18, 2019, in Brooklyn, New York.[1]

*Intercepted Communications*

9.  Through monitoring of wire and electronic communications occurring over phones held by WHYTE and Royshawn ALLGOOD pursuant to authorizations granted by the Honorable U.S. District Court Judge Michael P. Shea,[2] law enforcement were able to determine that

---

[1] WHYTE and other individuals were previously named in the original indictment returned on March 7, 2019. *United States v. Whyte et al.*, 3:19cr64(VLB).  Doc. 29.  The superseding indictment added GORDON and one other defendant to the conspiracy charge, as well as additional substantive counts pertaining to other defendants.  *United States v. Whyte et al.*, 3:19cr64(VLB).  Doc. 426.

[2] On November 19, 2018, United States District Judge Michael P. Shea signed an order authorizing the interception of wire communications occurring over Target Telephone-2, utilized by Allgood, and Target Telephone-3, utilized by WHYTE.  Interception pursuant to the November 19, 2018 authorization commenced on November 19, 2018 and terminated on December 18, 2018.  On December 18, 2018, United States District Judge Michael P. Shea signed an order authorizing the continued interception of wire communications and the initial interception of electronic communications occurring over Target

WHYTE was distributing controlled substances in addition to conspiring with others to distribute controlled substances, and that GORDON, who was based in Brooklyn, New York, had been acting as the source of supply for WHYTE.

10. For instance, on November 23, 2018, at 16:16 EST in session 690 intercepted over Target Telephone-3, WHYTE spoke to GORDON, who was using Target Device-1.  During the call, the following conversation occurred:

> AW:  Hello
> GG:  I do the thing, you don't want it man?
> AW:  Hold on, hello?
> GG:  You don't want the thing man?
> AW:  I'm coming in on Sunday Bigs. My baby mother's mother is dead so it is crazy, I am at funeral working at the repasts right now, but Sunday l will be coming in.
> GG:  Alright, alright.

11. Based on my training and experience, I believe that in the conversation set forth above, GORDON contacted WHYTE to determine if he intended to come to New York to purchase cocaine from GORDON ("I do the thing, you don't want it man").  WHYTE responded that he wanted to purchase the cocaine but was delayed due to a death ("I'm coming in on Sunday Bigs. My baby mother's mother is dead so it is crazy").  During the call, WHYTE referred to GORDON by his alias, "Bigs."  Communications subsequently intercepted over Target

---

Telephone-3, as well as the initial interception of wire and electronic communications occurring over Target Telephone-5, utilized by ALLGOOD, and another phone utilized by WHYTE, Target Telephone-4.  Interception pursuant to the December 18, 2018 authorization commenced on December 18, 2018 and terminated on January 17, 2019.  On January 24, 2019, United States District Judge Michael P. Shea signed an order authorizing the continued interception of wire communications and the initial interception of electronic communications occurring over Target Telephone-3 and Target Telephone-5, as well as the initial interception of wire and electronic communications occurring over two phones used by WHYTE, Target Telephone-6 and Target Telephone-7.  On January 28, 2019, United States District Judge Michael P. Shea issued an amended Order pertaining to Target Telephone-5 to connect an error in the IMSI number.  Target Telephone-5 commenced January 29, 2019 and is ongoing.  Interception for Target Telephone-3, Target Telephone-6, and Target Telephone-7 commenced on January 26, 2019 and ceased on February 20, 2019.

Telephone-3 and the location information for Target Telephone-3 establish that WHYTE went to New York and met with GORDON on November 26, 2018.

12. On November 27, 2018, at 14:20 EST in session 1347 intercepted over Target Telephone-3, WHYTE spoke to GORDON, who was using Target Device-1.  During the call, the following conversation occurred:

> AW:   Hello!
> GG:   Yo, yo! What up, Fam'?
> AW:   Yo, I meant to call you. You know? Uh... Them thing uh..., one eighty-seven. [Overlap]
> GG:   Yeah?
> AW:   I have some mash up [U/I], but it one... It come out to one eighty-seven.
> GG:   Alright then. Alright then. They nice though right? Them like them?
> AW:   No, me just had put them on. So, me don't know. It just I did everything, you know. That's how come I was just going to call you.
> GG:   Yeah, yeah, that's [U/I]. I see the rest, then he said I'ma give you some of this [U/I]. You know.
> AW:   Yeah, man. I will let you know as soon as I can.
> GG:   Yeah.
> AW:   Alright.
> GG:   Alright, cool.

13. Based on my training and experience, I believe that in the call set forth above, WHYTE informed GORDON that the pills he purchased from GORDON on November 26, 2018 totaled 187 pills ("them thing uh…, one eighty seven").  GORDON asked if WHYTE liked the quality ("they nice though right").  GORDON stated that he would supply the rest to WHYTE next time they met ("just let me know I save the rest, instead of giving them to somebody else").

14. On December 5, 2018, at 14:51 EST in session 2830 intercepted over Target Telephone-3, WHYTE spoke to GORDON, who was utilizing Target Device-1.  During the call, the following conversation occurred:

> AW:   Yeah Bigs, you and I have to deal with the books like I said, because your numbers and mine are off.
> GG:   No it is fifty eight six man, trust me.

AW:    l have that written down from when l go. We had fifty-one six when I came and I took a half thing, right? I have it written down from then, every time I came down there, whatever I gave you I wrote it down and whatever I took from you I wrote it down. I have it written down straight and I can give it to you straight right now.

AW:    You see me? I came down and I had fifty-one six for you and I took a half thing which is is sixteen that puts us at sixty-seven six right? Then the next trip I came down I gave you a forty. Right? Forty now it leaves twenty-seven six and then I took a thirty-two plus a four. I think it was the two, the two [Voice Overlap][. . .]

GG:    Thirty-two plus thirty-two plus twelve plus two. You said you not add on the thing that you get from my youth, plus two plus two.

15. Based on my training and experience, as well as information gathered to date in this investigation, I believe that in the portion of the conversation set forth above, WHYTE and GORDON were discussing cocaine purchased by WHYTE from GORDON and the amount of money WHYTE owes GORDON. I believe that WHYTE purchased kilogram quantities of cocaine from GORDON at $32,000.00/kilogram ("I took a half thing which is is sixteen") and that during the call, GORDON and WHYTE were attempting to reach an agreement regarding the entire debt owed by WHYTE to GORDON with WHYTE asserting that he had written down the transactions ("I have to deal with the books like I said, because your numbers and mine are off").

16. During the investigation, evidence established WHYTE's use of a coconspirator, Jackie HERNANDEZ, to obtain cocaine from GORDON in New York and bring the cocaine back to Connecticut for distribution. For instance, on December 23, 2018, at 9:24 EST in session 6160 intercepted over Target Telephone-3, WHYTE spoke to HERNANDEZ, who was utilizing telephone number ████-6257. During the call, the following exchange occurred:

JH:    You gotta text me the address. I told you I get out at one.

AW:    See, I didn't even know that. I thought you didn't even work today.

JH:    I told you, I... JACK, I told you I get out at one and you told me... I told you that when you first told me to do it. I said, I get out at one. I can go right from Niantic [. . .]

AW:    Yeah, just call me... Call me before you leave, because this nigga ain't fucking answering his phone.

JH:    Alright, so even better.

17. Subsequently on December 23, 2018, at 13:10 EST in session 6187 intercepted over Target Telephone-3, WHYTE sent an outgoing text message to HERNANDEZ that contained a specific address in New York that is approximately 1.5 miles from the Parkside Avenue Address.

18. Based on my training and experience, I believe that in the call and text messages set forth above, HERNANDEZ and WHYTE discussed their intention for HERNANDEZ to drive to New York to deliver cocaine WHYTE was to obtain from GORDON back to Connecticut. HERNANDEZ's request that WHYTE "text" her the address further evidences that the two were traveling separately.  Subsequent intercepted communications establish GORDON's coordination with WHYTE regarding his arrival in New York, HERNANDEZ's arrival at the location specified by WHYTE, as well as WHYTE and HERNANDEZ's return to Connecticut.

19. Law enforcement conducted a motor vehicle stop on HERNANDEZ's vehicle during her travel in Connecticut and recovered approximately one kilogram of cocaine from the trunk of her vehicle.  The basis for the traffic stop was failure to drive at a reasonable distance; HERNANDEZ was arrested and charged accordingly. HERNANDEZ was interviewed post-Miranda. HERNANDEZ stated that she went down to New York to visit a relative that was visiting from Kansas. HERNANDEZ stated that while she was in New York, she let an individual, who she thought was a cousin, borrow her vehicle.  HERNANDEZ stated an hour later, she entered the vehicle and traveled back to Connecticut.  HERNANDEZ did not know the cousin's name.

20. Subsequent intercepted communications establish not only that WHYTE placed the cocaine in HERNANDEZ's car, but that he also posted her bail.  For instance, on December 24, 2018, at 10:12 EST in session 6350 intercepted over Target Telephone-3, WHYTE spoke to

GORDON.  During the call, the following exchange occurred:

> AW:  Yo Biggs me and you have to get together today boy and talk, I have some bad news.
> GG:  What happened?
> AW:  The girl got touched with the stuff dog.
> GG:  How is that?
> AW:  Going up, because I was not going up that is why I made her come down. My friend me and said she did not come, so we started to search, search, search. The boys got her.
> GG:  So, did you guys put her in a different vehicle?
> AW:  Yes, she was in her vehicle.
> GG:  (Kiss his teeth) [UI], because I just lost over $280 Sunday... Saturday morning. (Kiss his teeth) [. . .]
> AW:  It was me, I put it in her trunk underneath the bloodclat tire. I put it in there myself.
> GG:  (mumbling) (groaning noises)
> AW:  Right now, it's her that we are trying to get out, because I cannot have her in there because I do not want them to get in her head, you know what I am saying?

21.  Based on my training and experience, I believe that in the portion of the call set forth above, WHYTE called GORDON to inform GORDON of HERNANDEZ's arrest and the seizure of the cocaine ("I have some bad news").  I further believe WHYTE explained that the cocaine was discovered based on a canine alert ("The girl got touched with the stuff dog") and admitted that he concealed the cocaine himself in the truck of HERNANDEZ's car ("It was me, I put it in her trunk underneath the bloodclat tire. I put it in there myself").  WHYTE further explained that he was working to pay HERNANDEZ's bail to ensure that law enforcement did not have time to pressure her to cooperate ("Right now, it's her that we are trying to get out, because I can not have her in there because I do not want them to get in her head").

22.  Following HERNANDEZ's arrest on December 23, 2018 with a kilogram of cocaine obtained by WHYTE from GORDON (discussed in more detail below), WHYTE and GORDON had several discussions pertaining to the arrest and their resulting potential exposure.  For instance, on January 13, 2019, at 16:00 EST in session 9758 intercepted over Target Telephone-

3, WHYTE spoke to GORDON.  During the call, the following conversation occurred:

GG:    Yeah. Yeah. So how's system? [UI] thing is working?

AW:    Yeah, you know. I put a um, "lay lay" on that. [Voices Overlap]. It's just continuing, continuing right now. He's trying to see, they are trying to put it in the big court cause of those. You know? But they are trying to stop it, because this is her first, first, first. You zimmie?

GG:    Mm. [UI] yeah. Oh, that's what they want to do?

AW:    Yeah, they want to put it in the big place.

GG:    Dam.

AW:    Because it's so much, you know?

GG:    So, they never found why the reason why?

AW:    What you mean?

GG:    They pulled. [Voices Overlap]. There suppose to have. And she never gave them permission.

AW:    Yeah because she. She never gave them that, but plus they said they smelled the "ray, when they pulled her over. [Voices Overlap]. But, they said they pulled her over cause they seen. They seen her on her phone.

GG:    Okay. Okay.

AW:    Now when they pulled her over they smelled the, "ray, ray". [Voices Overlap]. You know?

GG:    Okay.

AW:    And then they brought the boy. The other things and they smelled, you zimme.

GG:    Man. Fuck. Mm.

AW:    Mm. But, we are on it. [Voices Overlap].

GG:    But she's not stressing it though?

AW:    No. [Voices Overlap]. She good man. I make sure, I. You know? I make sure. [Voices Overlap].

GG:    Okay, [UI]. Yeah, but because you said what those people could say, you know?

AW:    Yeah, but that's what i'm waiting to. [Voices Overlap].

GG:    Just hope she can hold her. You know?

AW:    That's what. No man, she's holding it, man. The only thing I'm seeing is if their going take. You know?

GG:    Yeah.

AW:    I told her that if anybody come and even "ray, ray" to her, don't talk to nobody just [UI]. give them the "ray, ray" number and say, "that's who you talk to", don't talk to nobody.

GG:    Yeah. Yeah. Yeah. They didn't make any attempts though, right?

AW:    Nah, they didn't. Mm-mmm. The same time when they, when it happened.

GG:    Yeah.

AW:    That same night, I made sure she touched road. You know?

GG:    Yeah. Yeah. Yeah.

AW:    Yeah. She. They only had her for about, maybe a hour.

GG:    Yeah.

AW:    Yeah. Hour, maybe hour and ten minutes. When they. When she. When they put thing on her, I went for her. Right away, that night. I made her fam. [Voices

|       | Overlap]. |
|-------|-----------|
| GG:   | So you have somebody down there that can bonds [UI]. |
| AW:   | Yeah man. I have bond-sy people, man. |
| GG:   | Okay. Okay. Okay. [Voices Overlap].I know down here. Down here is more wicked. |
| AW:   | Mm-hmm. Cause. But, New York is more wicked. Up here, once you formulate a "ray, with and I already had them for a long time. So, all I have to do is call them and they're up all night. They're there all night. [Voices Overlap]. And once you have the paper work, they go there. |
| GG:   | Yeah. Yeah. You addressed everything right. [Voices Overlap]. |
| AW:   | Yeah. Yeah, thirty minutes and they, you zimme [understand]? |
| GG:   | Okay. Okay. As long as she knows that she's good. That's why I don't worry about it, you know? [Voices Overlap]. |
| AW:   | Yeah man, she's good, man. She's good. [Voices Overlap]. |
| GG:   | Mm-hmm. Alright let me [UI] going on them. Alright, cool. Cool. |
| AW:   | Alright. |

23. Based on my training and experience, I believe in the above discussion, WHYTE and GORDON spoke about HERNANDEZ's December 23, 2018 arrest, with WHYTE updating GORDON that the State of Connecticut was pursuing serious charges against HERNANDEZ ("they are trying to put it in the big court") and GORDON inquiring whether WHYTE had learned any additional details regarding why the police stopped HERNANDEZ ("so they never found why the reason"). WHYTE explained that the officers stated they smelled marijuana ("they said the smelled the ray ray when they pulled her over"). WHYTE stated that HERNANDEZ was not worried, however, and that he did not believe she would cooperate with authorities ("she good man. I make sure. [. . .] she holding it, man"). WHYTE went on to assure GORDON that HERNANDEZ was only in police custody for approximately one hour before he paid her bond ("that same night, I made sure she touched the road [. . .] they only had her for about, may an hour").

24. Following HERNANDEZ's arrest, WHYTE began using another charged coconspirator, Holly BUTLER, to transport cocaine purchased from GORDON in New York to Connecticut. For instance, on January 16, 2019, at 9:57 EST in session 10144 intercepted over Target

Telephone-5, WHYTE spoke to GORDON, who was using Target Device-1.  During the call, the following conversation occurred:

GG:   Yo, a youth called to tell me that he has one of the thing here for you, but you have to check because I am leaving 3'O Clock in the morning. You understand, so [Voices Overlap]
AW:   So I have to flash in today, today, today?
GG:   Yeah, because I won't be around.
AW:   Alright I will try to made a move, I will try make some...., I will call you right back.
GG:   Yea

25.  Based on my training and experience, I believe that in the above exchange, GORDON informed WHYTE that he had cocaine to supply WHYTE ("a youth called to tell me that he has one of the ting here for you") but that WHYTE would need to meet GORDON to complete the narcotics transaction that day as GORDON was going out of town ("because I leave").  WHYTE acknowledged his understanding that the transaction would have to occur that day ("So I have to flash in today, today, today") and stated that he would call GORDON back once he determined whether he could travel to New York ("Alright I will try to make a move").

26.  Shortly thereafter on January 16, 2019, at 9:58 EST in session 10146 intercepted over Target Telephone-3, WHYTE spoke to another coconspirator, Holly BUTLER, who was using telephone number ███-6146.  During the call, the following conversation occurred:

HB:   Hello!
AW:   Hey, tell me you don't work today.
HB:   I do, at 4:00.
AW:   At what?
HB:   I do, at four (4). Why what's up?
AW:   I mean, if we leave like around now we could get back for four (4), [from the] city. Think about it. Call me. I'll try to see if anybody else... You feel me?
HB:   What time is it?
AW:   It's like 10:00 now.
HB:   Think we could make it?
AW:   Mm-hmm. 10, 11, 12, 1, 2, 3, f... Yeah! We get down there... Cause... I'll rush to Norwich now. [Sighs]
HB:   [Sighs] [Pause] Alright.

AW:   [Sniffles] Alright.
HB:   Alright.

27. Based on my training and experience, I believe that in the above call, WHYTE contacted BUTLER because he wanted travel with her to New York ("the city") to meet with GORDON. WHYTE and BUTLER discussed their ability to drive to New York to obtain cocaine from GORDON before 16:00 EST when BUTLER had to work ("tell me you don't work today; I do at 4:00").

28. On January 16, 2019, at 10:40 EST in session 10172 intercepted over Target Telephone-3, WHYTE and BUTLER, who was using telephone number ███-6146, spoke again. During the call, the following exchange occurred:

AW:   I'm on my way. I gotta stop, I'm almost there. I'ma stop at the house to grab the bread, though.
HB:   Alright

29. Based on my training and experience, I believe that in the above call, WHYTE contacted BUTLER to update her regarding his arrival ("I'm on my way") and explained that he had to stop to obtain the "bread," a common coded reference to money.

30. Utilizing the communications intercepted over Target Telephone-3, law enforcement established surveillance on WHYTE and BUTLER at a gas station on the New London Turnpike in Norwich, Connecticut. Officers observed WHYTE pumping gas into BUTLER's white BMW before entering the front passenger seat. Surveillance followed BUTLER and WHYTE to New York. Surveillance subsequently observed BUTLER/WHYTE in the BMW meet a white Nissan in a business parking lot in Laurel, New York. The two vehicles then departed the parking lot with the BMV following the Nissan. Surveillance temporarily lost both the BMW and the Nissan. Approximately twenty minutes later, surveillance observed the two cars park near each other. Surveillance then observed WHYTE exit the Nissan's front passenger seat carrying a

14

large white shipping package and open the BMW's truck. After a brief period, WHYTE entered the BMW's front passenger side and the vehicle departed. Surveillance followed WHYTE and BUTLER as they returned WHYTE's residence in Connecticut. Surveillance observed WHYTE briefly open and close the BMW's trunk before carrying the white large shipping package into his apartment building. Surveillance followed the Nissan and identified GORDON as the operator and sole occupant of the Nissan. Based on my training and experience, I believe that BUTLER and WHYTE travelled to New York and met with GORDON as discussed in the intercepts (sessions 10144, 10146, and 10172) set forth above. I further believe that during the meeting, WHYTE obtained a kilogram of cocaine from GORDON before returning to Connecticut and transferring the cocaine to his stash location located in his apartment complex.

31. Previously, on December 28, 2018, BUTLER made a trip to New York with WHYTE in her BMW. Pole camera footage from outside WHYTE's apartment complex establishes that WHYTE and BUTLER met prior to their trip to New York and BUTLER was observed opening the BMW's trunk for a short period of time before the two departed for New York. After their return from New York, WHYTE and BUTLER retrieved a bag from the BMW's trunk, using a cellular phone as a flash light to assist their retrieval of the bag. WHYTE then transported the bag into his residence. Based on my training and experience, I believe that as they did on January, 16, 2019, BUTLER and WHYTE travelled to New York on December 28, 2018, obtained cocaine from GORDON, concealed the cocaine in the trunk of BUTLER's BMW on their return to Connecticut, and then transferred to the cocaine to WHYTE's stash location at his apartment complex.

***Recovery of Target Devices and Additional Evidence Gathered in Connection to Arrest***

32. On August 19, 2019, law enforcement arrested GORDON pursuant to a federal warrant issued as a result of the indictment. At the time of his arrest, agents recovered three phones from GORDON's person: Target Devices 1, 2 and 3. Agents called the number 516-395-9501, GORDON's phone number intercepted during wiretap investigation, and observed Target Device-1 ring. Incident to GORDON's arrest, law enforcement searched the black Nissan GORDON was operating and seized Target Devices 4, and 5. At the time of his arrest, law enforcement recovered approximately $4,465.00 from GORDON's person, as well as approximately $8,725.00 from the black Nissan. Law enforcement also recovered multiple receipts for electronic monetary transfers in various amounts from $200 to $500 dollars. GORDON also had on his person a key-fob for a vehicle other than the black Nissan.

33. On August 22, 2019, law enforcement also obtained a search warrant from the Honorable United States Magistrate Judge Cheryl L. Pollak to search a second vehicle associated with GORDON, a silver Nissan (hereafter referred to as the "Subject Vehicle"), after law enforcement identified the Subject Vehicle as connected to GORDON. More specifically, when officers pushed the panic button on the key-fob recovered from GORDON, a four-door silver Nissan bearing Florida license plates (the Subject Vehicle) responded. At the time, the Subject Vehicle was parked on the street near an apartment associated with GORDON (hereafter referred to as the "Subject Premises"). Like the black Nissan, the Subject Vehicle is also registered to GORDON's mother in New York, however, the Subject Vehicle has Florida license plates.

34. On August 22, 2019, law enforcement employed the use of a drug-sniffing canine, K-9 Hogan, trained to alert to the presence of narcotics and narcotics proceeds, along the exterior of

the Subject Vehicle while it was parked on the street.  K-9 Hogan alerted to the driver's side of the Subject Vehicle for the presence of narcotics and/or narcotics proceeds.[3]

35. From the subsequent search of the Subject Vehicle pursuant to the search warrant, officers recovered approximately 1.1 kilograms of cocaine, a scale, plastic baggies, and a 9mm firearm from the vehicle's trunk.  From the Subject Vehicle's glove box, law enforcement recovered receipts connecting GORDON to the Subject Premises.  For instance, law enforcement recovered a receipt in the name of one of GORDON's known aliases, Geoffrey Brown, which listed his address as the Subject Premises.

36. With respect the Subject Premises, GORDON attempted to disclaim any connection to the Subject Premises following his arrest.   More specifically, information obtained as a result of prior authorization to obtain location information for the cellular device utilized by GORDON and intercepted during the investigation (Target Device-1), evidences that GORDON was continuing to utilize Target Device-1 until his arrest.  Additionally, the location information for

---

[3] The K-9 Hogan and Connecticut State Police Detective Nate Charron were certified by the Connecticut State Police, on July 08, 2016 after completing 10 weeks of training and imprinting.  Hogan was trained to detect the odor of the following substances.  Marijuana, Hashish, Cocaine, Crack Cocaine, Heroin, MDMA, Methamphetamine, and Anabolic Steroids.  Upon locating one of these substances K-9 Hogan was trained to sit at the source of the odor.  This sit is called a "passive alert."  This alert may also indicate items recently contaminated with, or associated with the odor of one or more these substances.  K-9 Hogan was certified on the recognition of these odors by the Connecticut State Police Forensic Science Lab on June 26, 2016 and most recently re-certified in November 2018. K-9 Hogan and Connecticut State Police Detective Nate Charron train daily on all the odors that the dog is trained to detect.  This training averages over 40 hours a month and includes training in all areas of interdiction, such as vehicles, boats, truck tractor and trailers, people, schools, currency, parcels and mail, airports and airplanes, buses and bus terminals, storage units, residences, trains and train stations, prisons, hotels and motels and apartments.  The training includes novel odors, such as odors that are distracting, masking or new.  Finally, the training includes controlled-negative (blank) testing, in which all objects or locations have no contraband present. Extinction training methods are used to "proof" the dog and prevent him from alerting to common items (such as bags, tins, boxes, etc.) associated with controlled substances.  Connecticut State Police Detective Nate Charron maintains daily training logs and these logs are maintained by me as well as the Connecticut State Police Canine Unit.  K-9 Hogan and Connecticut State Police Detective Nate Charron have participated in hundreds of controlled substance searches and have been present for and observed hundreds more conducted by other canine handlers.

Target Device-1 evidences that GORDON spent a considerable amount of time at a location in the back of an apartment building on Parkside Avenue consistent with the location of the Subject Premises.

37. Further, law enforcement conducting surveillance have observed GORDON exit a bodega across from the Subject Premises and enter the building.  Indeed, during the time frame in December 2018 into January 2019 when intercepted communications evidenced WHYTE would travel to Brooklyn, New York, to purchase kilogram quantities of cocaine from GORDON, law enforcement observed GORDON come and going from the apartment building containing the Subject Premises on numerous occasions.  Additionally, during one of the surveillance operations officers subsequently canvased the apartment building containing the Subject Premises in an effort to determine which unit GORDON used by knocking on each door in the building. Apartment 6K, the Subject Premises, was the only unit at which no one answered and officers did not see GORDON when any of the other apartment occupants opened their doors in response to the officers' knocks.

38. A review of records evidence that the Subject Premises is leased to GORDON's mother and that the utilities for that apartment are also in her name.  Notwithstanding the connection between the Subject Premises and both GORDON and his mother, GORDON has attempted to refute any connection between himself and that location.  When GORDON was arrested on August 18, 2019, he initially told officers that the Subject Premises was his mother's residence. At the time of his arrest, GORDON had a door key in his possession that he admitted was for the Subject Premises.   He then changed his story, asserting that he stays at the apartment occasionally when visiting his niece who lives at the Subject Premises.  During his initial presentment hearing, GORDON again asserted a different connection to the Subject Premises,

stating that he has been living with a girlfriend on Woodruff Avenue, which is a few blocks from the Subject Premises, he disclaimed knowledge about the Subject Premises, and he asserted that he does not spend any time at the Subject Premises. The location information for Target Device-1, however, reveals that GORDON is primarily at the Subject Premises overnight during the dates reviewed. Moreover, as part of his bond proposal following his recent arrest, GORDON asserted that he would reside with his mother at her address located in Central Islip, New York, not the Subject Premises, without any mention of her connection to the Subject Premises.

39. Additionally, as mentioned above, law enforcement obtained a search warrant for the Subject Premises on August 23, 2019.[4] When law enforcement executed the search warrant, they recovered approximately $15,000 concealed in a mini iPad box wrapped in cellophane from GORDON's closet that was wrapped in pants, a black AT&T, LG flip phone from Gordon's dresser (Target Device-6), and an H20 Wireless 4G LTE smart SIM card with receipt bearing telephone number 313-802-1475 from lining of GORDON's jacket in his closet (Target Device-7).

40. In summary, the intercepted communications set forth above are merely a sampling of the communications in which GORDON utilized a cellular device to traffic narcotics and communicate with coconspirators. Given the substantial evidence that GORDON utilized a cellular device to traffic narcotics, the recovery of the Target Devices from GORDON, and the recovery of additional evidence (including narcotics, narcotics proceeds, and a firearm) from GORDON, all combined with my training and experience regarding common practices employed by narcotics traffickers with respect to cellular telephones including their use of multiple cellular

---

[4] The Government initially sought a warrant to search the Subject Premises at the same time as the Subject Vehicle. The Government voluntarily withdrew that portion of the application pending search of the Subject Vehicle, which resulted in the collection of additional evidence. The Government then represented a revised warrant, which was authorized.

telephones in an attempt to limit law enforcement detection, compartmentalize narcotic customers/sources, and communicate with narcotic customers/sources, I believe that each of the Target Devices will contain evidence of the Target Offenses. Indeed, as noted above, I know from my training and experience, that drug traffickers commonly utilize cellular devices to arrange and facilitate narcotics transactions. I also know that drug traffickers will frequently switch or replace devices and phone numbers in an effort to avoid law enforcement detection. I also know that narcotics traffickers will often utilize more than one cellular device in an effort to segregate customers/sources of supply. I also know that narcotics traffickers will keep their phones close by, either on their person or in a location at which they can easily access the device to communicate with sources of supply/narcotic customers.

41. For the foregoing reasons, there is probable cause to believe, and I do believe, that evidence of the Target Offense will be found on each of the Target Devices.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANTS FOR THE TARGET DEVICES

42. Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **Target Devices** there will be found items which constitute evidence of the crimes of the Target Offenses.

43. Based on my training, experience, I also know that the aforementioned **Target Devices** may have some or all of the capabilities that allow each phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

44. With regards to the **Target Devices**, I request permission to seize and search the Target Devices for evidence relating to the Target Offenses.

45. Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that the **Target Devices** were used by the defendants to communicate with co-conspirators in the unlawful distribution of narcotics and/or firearms. Furthermore, based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics and/or firearms, or conspire to do so. Also based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics and/or firearms. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics and/or firearms, the quantity of narcotics and/or firearms, as well as shipping packages within which the narcotics are concealed. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics and/or firearms:

    a.    the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

    b.    the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.    descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.    any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said devices;

h.  internet browsing history, to include, internet searches in the memory of said device; and

i.  images and videos in the memory of said device.

46. It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

47. It is also requested that each warrant be deemed executed once the items listed in **Attachment A** have been extracted from the respective phone and that further analysis of the seized items be permitted at any time thereafter.

48. It is also requested that stored electronic information, data, information and images contained in the **Target Devices** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS
## OF THE TARGET DEVICES

49. The warrants applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

50. As described above and in **Attachment B**, the undersigned Affiant seeks permission to search and seize evidence that the **Target Devices** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

51. Searching for the evidence described in **Attachment B** may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in **Attachment B**, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in **Attachment B**.

## CONCLUSION

52. I submit that this affidavit supports probable cause for search warrants to seize the Target

Devices described herein and to search the Target Devices for the items described in **Attachment**

**B** for evidence of the Target Offenses.

_____

Keith Warzecha
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 28th day of
August 2019.

/s/ Sarah A. L. Merriam, USMJ
_____
SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

1.　　The property to be searched, the Target Devices, are presently in DEA custody after being seized.  The Target Devices are:

    i.   Silver Apple iPhone S, Model A1687, in a black case in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-1");

    ii.   Black AT&T Samsung Galaxy S9+ in a clear case in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-2");

    iii.   Black LG AT&T flip phone number Model LGB470, assigned telephone number: 907-599-0284, in DEA Evidence Bag S0001240571 (hereafter referred to as "Target Device-3");

    iv.   Black AT&T flip phone Model SGH-A157, in DEA Evidence Bag S001240572 (hereafter referred to as "Target Device-4");

    v.   Black and Blue Alcatel smart phone Model 50595, in DEA Evidence Bag S001240572 (hereafter referred to as "Target Device-5");

    vi.   Black AT&T LG flip phone in DEA Evidence Bag S001240594 (hereinafter referred to as "Target-Device-6"); and

    vii.   a H20 Wireless 4G LTE smart SIM card with receipt bearing telephone number 313-802-1475 (hereafter referred to as "Target Device-7").

**ATTACHMENT B**
**PARTICULAR ITEMS TO BE SEIZED**

1.   All records presently on the Target Devices (description in Attachment A incorporated herein), and all deleted records which are able to be recovered from the Target Devices as they related to violations of Title 21, United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute Narcotics); Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute and Distribution of Narcotics), Title 21, United States Code, Section 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony); Title 18, United States Code, Section 924(c) (Use of a Firearm in Furtherance of a Drug Trafficking Crime); 18 U.S.C. § 922(g)(1) (hereafter referred to as the "Target Offenses") by Geoffrey GORDON and others, including:

   b.  the telephone number, ESN number, serial number, and SIM card number;

   c.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory that pertain to the above described-crimes;

   d.  descriptions of time, date, locations, items, or events showing the commission of, or connecting a person to, the above-described crimes;

   e.  all records, however created or stored, which demonstrate ownership and use of the device;

   f.  any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

   g.  contact information associated with other individuals connected to the above-described crimes; and

   h.  images and videos in the memory of said device that pertain to the above described-crimes;

2.   It is specifically authorized that stored electronic information, data, information and images seized may be reproduced by printing, converting, or coping into storage in another device.

3.   It is specifically authorized that the warrants will be deemed executed once the seized items are extracted or copied from the respective device and that further analysis of the seized items extracted or copied from the respective device is permitted at any time thereafter.